## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 18 CR 00087-2 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| DANNY REEDY, | ) | |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Danny Reedy's *pro se* motions for a reduction of sentence under U.S.S.G. § 4C1.1, U.S.S.G. § 5C1.2, and 18 U.S.C. §§ 3582(c)(1)(A)(i) and (c)(2). (Dkts. 298, 303, 314). For the following reasons, the Court denies Reedy's motions for a reduction of sentence [298], [303], [314].

## BACKGROUND

Danny Reedy is a federal inmate at FCP Duluth. (Dkt. 290). On February 27, 2020, Reedy pled guilty to one count of conspiracy to distribute a controlled substance and to possess with intent to distribute a controlled substance, namely one kilogram or more of heroin, in violation of 28 U.S.C. § 846. (Dkt. 179). At sentencing, the applicable sentencing range under the guidelines was 97–121 months based on a total offense level of 29 and a criminal history category of II. (Dkt. 273). The Court considered the seriousness of Reedy's offense (including heroin's significant harm to the public), Reedy's history and characteristics, age, and acceptance of responsibility, among other factors. (Dkt. 273). The Court sentenced Reedy to 120 months' imprisonment, 5 years' supervised release after the term of imprisonment, and a $100 special assessment. (Dkt. 272). The

term of 120 months' imprisonment is the mandatory minimum term of imprisonment under 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(i). (Dkt. 273).

Reedy is currently 62 years old. (Dkt. 312 at 1). He was committed to serve his term of incarceration on February 24, 2022. (*Id.* at 2). He has served 2 years and approximately 9 months of his 10-year sentence thus far. (*Id.*). When accounting for Reedy's earned time credits and projected time credits under the First Step Act, Reedy's projected release date is October 18, 2029. (*Id.* at 2). Reedy moves for a reduced sentenced under U.S.S.G. § 4C1.1, U.S.S.G. § 5C1.2, and 18 U.S.C. §§ 3582(c)(1)(A) and (c)(2), (Dkts. 298, 303, 314), which the Government opposes. (Dkts. 307, 316).

## DISCUSSION

In his first motion, Reedy argues a reduction of sentence is proper under 18 U.S.C. § 3582(c)(2) based on the adjustment for "zero-point offenders" provided by amended U.S.S.G. § 4C1.1, and under the compassionate release provision, 18 U.S.C. § 3582(c)(1)(A). (Dkt. 298). In his second motion, Reedy appears to abandon his argument based on amended U.S.S.G. § 4C1.1 but nonetheless contends a reduction of sentence is proper under 18 U.S.C. § 3582(c)(2) based on amended U.S.S.G. § 5C1.2, which concerns relief from mandatory minimum sentences, and under the compassionate release provision. (Dkt. 303). In his third motion, Reedy further argues a reduction of sentence is proper under the compassionate release provision, 18 U.S.C. § 3852(c)(1)(A). (Dkt. 314).

## I.    Impact of the *Loper Bright* Decision on the Court's Obligation to Follow Policy Statements of the Sentencing Commission under 18 U.S.C. § 3582(c)

At the outset, the Court must address Reedy's suggestion that the Court consider the impact of the Supreme Court's recent decision in *Loper Bright Enterprises*, which overruled the *Chevron* decision and the associated doctrine of *Chevron* agency deference. *Loper Bright Enterprises v.*

2

*Raimondo*, 144 S. Ct. 2244, 2273 (2024). Under the doctrine of *Chevron* deference, courts deferred to reasonable agency interpretations of ambiguous statutes based on the presumption of Congress's implied delegation of the authority to resolve statutory ambiguities to agencies imbued with general rulemaking power. *Id.* at 2254.

In this context, the Court's discretionary authority to modify an imposed term of imprisonment based on compassionate reasons (so-called compassionate release) and based on amendments to the sentencing guidelines derives from 18 U.S.C. § 3582(c). Both sub-sections (c)(1)(A) and (c)(2)—which respectively govern compassionate release and modifications based on guideline amendments—require the Court to find that any modification of an imposed term of imprisonment is "consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. §§ 3582(c)(1)(A), (c)(2). Reedy does not challenge the reasonableness of the Sentencing Commission's policy statements that apply here, but simply suggests the Court should consider the relevance of the *Loper Bright* decision for the application of the Sentencing Commission's guidelines and policy statements. (Dkt. 314 at 4). Construing this suggestion liberally, Reedy at most contends that the *Loper Bright* decision generally calls into question the deference the Court owes to the Sentencing Commission's policy statements. (*Id.*) Contrary to Reedy's suggestion, however, the deference owed to the Sentencing Commission's policy statements under § 3582(c) is not based on the *Chevron* doctrine and the presumption of implied delegation of authority to resolve statutory ambiguities thereunder.

Rather, the basis for the Court's deference to the Sentencing Commission's policy statements is twofold. First, the Court's deference to the Sentencing Commission's policy statements is based on Congress's *express* delegation of the authority to promulgate "policy statements regarding [...] aspect[s] of sentencing [...] [,] including the appropriate use of . . . the

sentence modification provisions set forth in [...] [section] 3582(c)[.]" 28 U.S.C. § 994(a)(2)(C) (outlining the duties of the Sentencing Commission). More specifically, Congress expressly delegated the authority to define the phrase "extraordinary and compelling reasons" under the compassionate release provision to the Sentencing Commission: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) [...] shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Congress also expressly granted the Sentencing Commission "the unusual explicit *power* to decide whether and to what extent its amendments reducing sentences will be given retroactive effect, U.S.C. § 994(u)." *Braxton v. United States*, 500 U.S. 344, 348 (1991). The Commission, of course, must exercise this expressly delegated authority to issue such policy statements "pursuant to its rules and regulations and consistent with all pertinent provisions of any Federal statute[.]" 28 U.S.C. § 994(a); *see United States v. Owings*, 2024 WL 4171197, at *4 (S.D. Ind. Sept. 12, 2024) ("We understand the guidance of the Sentencing Commission to be entitled to substantial deference, though that deference is not unlimited.").

Second, the Court's deference to the Sentencing Commission's policy statements is based on Congress's express command in § 3582(c) that the Court find any potential modification to be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. §§ 3582(c)(1), (c)(2). Under § 3582(c), "Congress expressly cabined district courts' discretion by requiring courts to abide by the Sentencing Commission's policy statements." *Concepcion v. United States*, 597 U.S. 481, 495 (2022); *see Dillon v. United States,* 560 U.S. 817, 821 (2010) (explaining that "[t]he substantial role Congress gave the Commission with respect to sentence-modification proceedings [under § 3852(c)(2)] further supports [the] conclusion" that

4

"Congress intended to authorize only a limited adjustment to an otherwise final sentence and not a plenary resentencing proceeding").

That the Sentencing Commission's authority to promulgate policy statements stems from an express delegation from Congress is significant because the *Loper Bright* court was careful to distinguish the form of express delegation from the form of implied delegation presumed under the *Chevron* doctrine. *Loper Bright*, 144 S. Ct. at 2259–60, 2263. Indeed, "some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term[,]" such that "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)). Similarly, "others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme[.]" *Id.* (citation omitted).

Where a party challenges an agency's exercise of its expressly delegated authority, *Loper Bright* instructs that a court satisfies its role of "interpret[ing] the statute and effectuat[ing] the will of Congress subject to constitutional limits" by "recognizing constitutional delegations, 'fix[ing] the boundaries of the delegated authority,' [...] and ensuring the agency has engaged in ' "reasoned decisionmaking" ' within those boundaries[.]" *Id.* at 2263, 2273 (citations omitted) ("And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."); *see Bernardo-De La Cruz v. Garland*, 114 F.4th 883, 890 (7th Cir. 2024). And "where Congress expressly delegates to the Commission the power to define terms, a 'reviewing court is not free to set aside those [guidelines] simply because it would have interpreted the statute in a different manner.' " *United States v. Watford*, 2024 WL 3633906, at *2 (N.D. Ind. July 30, 2024) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977)).

Accordingly, the Court concludes that the *Loper Bright* decision does not call into question the Court's deference to the Sentencing Commission's policy statements interpreting the sentence modification provisions. 18 U.S.C. § 3582(c). In promulgating the policy statements applicable here, the Sentencing Commission acted squarely within the bounds of its expressly delegated authority to issue policy statements outlining the appropriate use of the sentence modification provisions, defining the phrase "extraordinary and compelling reasons," and specifying which guideline amendments apply retroactively. 28 U.S.C. §§ 994(a)(2)(C), (t), (u). Furthermore, because Reedy does not challenge the reasonableness of the Sentencing Commission's applicable policy statements (but in fact relies upon them), the Court finds no cause to address that issue here. U.S.S.G. §§ 1B1.10, 1B1.13; 18 U.S.C. § 3582(c).

## II.  Sentence Reduction Based on Amended Guidelines under 18 U.S.C. § 3582(c)(2)

Now the Court turns to Reedy's requests for a sentence modification based on subsequent amendments to the sentencing guidelines. Where a defendant was sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission, the Court, after considering the applicable § 3553(a) factors, may reduce the term of imprisonment if the reduction is consistent with the applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(2); *Dillon*, 560 U.S. at 827. The Sentencing Commission's policy statement governing the reduction of a term of imprisonment based on an amended guideline range, contained in § 1B1.10, outlines which amendments to the guidelines may be applied retroactively to permit a reduction in a term of imprisonment. U.S.S.G. §§ 1B1.10(a)(2)(B), (d); *Dillon*, 560 U.S. at 827.

### A.  The Zero-Point Offender Adjustment under Amended U.S.S.G. § 4C1.1

First, Reedy argues a sentence reduction is proper under amended Guideline § 4C1.1. (Dkt. 298 at 1–3). Though in his second motion Reedy appears to abandon his initial argument that

he qualifies for a reduction in sentence as a zero-point offender based on the Federal Public Defender's notice informing him that he is ineligible for such a reduction, (Dkt. 303), the Court nonetheless writes briefly to address Reedy's initial argument. In 2023, Part B, subpart 1 of Amendment 821 added guideline § 4C1.1 to the Sentencing Guidelines. U.S.S.G. §§ 4C1.1(a)(1), 4C1.1 (historical note). Guideline § 4C1.1 provides for a reduction of the offense level by two points when the defendant is a "zero-point offender" who meets specified criteria, including first and foremost that the defendant did not receive any criminal history points from Chapter 4, Part A at the time of sentencing. U.S.S.G. §§ 4C1.1(a)(1), 4C1.1 (historical note). The adjustment of the offense level for zero-point offenders under guideline § 4C1.1 applies retroactively. U.S.S.G.§§ 1B1.10(a)(2)(A), 1B1.10(d).

Here, Reedy does not qualify as a "zero-point offender" because, at the time of sentencing, he received 3 criminal history points based on his sentence of 78 months' imprisonment for his 2007 conviction for possession with intent to distribute a controlled substance, pursuant to Guideline § 4A1.1(a). (Dkt. 273 at 1; Dkt. 195 at 8; Dkt. 307 at 9). Additionally, even assuming Reedy were entitled to the 2-point reduction in the offense level, which would result in an offense level of 27, Reedy would still not be entitled to a reduction in his term of imprisonment due to the mandatory minimum sentence for his offense. The guideline range for an offense level of 27 and a criminal history category I (the adjustment requires the defendant received zero criminal history points which establishes a criminal history category of I) is 70–87 months. U.S.S.G. Ch. 5, Pt. A. Because the mandatory minimum sentence of 120 months' imprisonment is greater than the maximum of the guideline range that would apply after the adjustment (87 months), the mandatory minimum sentence of 120 months' imprisonment "shall be the guideline sentence."

U.S.S.G. § 5G1.1(b). Reedy's argument for a reduction of sentence under Guideline § 4C1.1 therefore fails.

To the extent Reedy argues a reduction of sentence is also proper based on amended guideline § 4A1.1(e), which, after Amendment 831 in 2024, provides for the addition of 1 criminal history point where a defendant receives 7 or more points under sub-sections (a)–(d) and committed the instant offense under any criminal justice sentence. (*See* Dkt. 298 at 3–4); U.S.S.G. § 4A1.1(e). Because Reedy did not commit the instant offense while under a criminal justice sentence, guideline § 4A1.1(e) did not apply at the time of his sentencing. The amendment to guideline § 4A1.1(e) therefore does not provide a basis for a sentence modification. 18 U.S.C. § 3582(c)(2). Accordingly, the Court denies Reedy's first motion, (Dkt. 298), as it relates to his claims for a sentence reduction under amended guidelines §§ 4C1.1 and 4A1.1.

### B. Relief from Mandatory Minimum Sentence under Amended U.S.S.G. § 5C1.2 & 18 U.S.C. § 3553(f)

Second, Reedy argues a reduction of sentence is proper under amended U.S.S.G. § 5C1.2, which provides guidance on the so-called safety valve provision concerning mandatory minimum sentences, 18 U.S.C. § 3553(f). (Dkt. 303 at 1). Section 3553(f) is a statutory safety valve for certain defendants whose offenses carry a mandatory minimum sentence. 18 U.S.C. § 3553(f). Section 3553(f) requires a court to impose a sentence pursuant to the applicable guideline range "without regard to any statutory minimum sentence," if the court finds at sentencing that the defendant meets six eligibility requirements. 18 U.S.C. §§ 3553(f)(1)–(6). Guideline § 5C1.2 largely mirrors § 3553(f) and provides guidance on how to apply the statutory provision. U.S.S.G. § 5C1.2, comment. (backg'd., historical note). In 2023, Amendment 817 modified guideline § 5C1.2 to reflect the First Step Act's changes to § 3553(f)'s eligibility requirements. *Id.*

Here, Reedy is not entitled to relief under the amended guideline § 5C1.2(a)(1)(B). First, Amendment 817's changes to guideline § 5C1.2 do not apply retroactively to permit a reduction in the term of imprisonment. *See* U.S.S.G. §§ 1B1.10(a)(2)(A), 1B1.10(d); U.S.S.G. § 5C1.2 (historical note). Second, even if the amendment to guideline § 5C1.2 were retroactive, Reedy does not qualify for relief because he has "a prior 3-point offense, as determined under the sentencing guidelines." U.S.S.G. § 5C1.2(a)(1)(B). Reedy's 2007 conviction for possession with intent to distribute a controlled substance is a prior 3-point offense because the sentence of imprisonment (76 months) exceeded one year, pursuant to guideline § 4A1.1(a). (Dkt. 195 at 8). Reedy's argument for a reduction of sentence based on guideline § 5C1.2 therefore fails. Accordingly, the Court denies Reedy's second motion, (Dkt. 303), as it relates to his claim for a reduction of sentence based on amended Guideline § 5C1.2.

### III.    Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)

Finally, in all three of his motions, Reedy argues a reduction of sentence is proper under the compassionate release provision, 18 U.S.C. § 3582(c)(1)(A). (Dkt. 298 at 4–6; Dkt. 303 at 1; Dkt. 314 at 1–5). Section 3582(c)(1)(a) "establishes a default rule that the district court 'may not modify a term of imprisonment once it has been imposed,' with a few exceptions." *United States v. Sanford*, 986 F.3d 779, 781 (7th Cir. 2021). Specifically, section 3582(c)(1)(a) grants the Court discretion to modify an imposed term of imprisonment upon a defendant's motion, where the following requirements are met: (1) the defendant satisfies the exhaustion requirement prior to filing the motion in the district court; (2) the Court finds that "extraordinary and compelling reasons warrant" a modification of the imposed term of imprisonment; (3) the Court finds that the applicable § 3553(a) factors favor a modification of the imposed term of imprisonment; and (4) the Court finds that a modification of the imposed term of imprisonment is consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).

9

Although Reedy's term of imprisonment reflects a mandatory minimum sentence, extraordinary and compelling reasons can "in particular cases supply the basis for a discretionary sentencing reduction of a mandatory minimum sentence." *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021) (citation omitted).

### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A)'s exhaustion requirement, while not jurisdictional, is a mandatory claim-processing rule that the Court must enforce when it is properly invoked. *Sanford*, 986 F.3d at 782. Under § 3582(c)(1)(A)'s exhaustion requirement, once a defendant takes the preliminary step of submitting a compassionate release request to the warden, a defendant may file a motion for compassionate release in the district court either (1) after "the defendant has fully exhausted all administrative rights to appeal [a denial of the request] or" (2) after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). Additionally, under § 3582(c)(1)(A)'s "issue exhaustion" requirement, a defendant must "present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court." *United States v. Williams*, 987 F.3d 700, 703 (7th Cir. 2021).

1. <u>First and Second Motions</u>

In its response to Reedy's first and second motions, the Government argues Reedy failed to exhaust the BOP's administrative remedies, citing Reedy's failure to submit a compassionate release request to the warden prior to filing a motion in this Court. (Dkt. 307 at 10). Reedy does not contend in either his first or second motion that he had previously submitted a compassionate release request to the warden. (*See* Dkts. 298, 303). With respect to his first and second motions, Reedy therefore failed to satisfy § 3582(c)(1)(A)'s exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A). Accordingly, the Court denies Reedy's first and second motions,

(Dkts. 298, 303), as they relate to his claim for compassionate release under § 3582(c)(1)(A), without prejudice for failure to exhaust administrative remedies.

2. <u>Third Motion</u>

In its response to Reedy's third motion, the Government incorporates by reference the arguments made in its first response, which include the defense of failure to exhaust administrative remedies. (Dkt. 316 ¶ 6). As of the filing of Reedy's third motion on October 1, 2024, Reedy, however, had submitted a compassionate release request to the warden on August 14, 2024. (Dkt. 314 at 8 (Ex. 1, Request to Staff)). On August 19, 2024, the warden responded via letter, denying Reedy's request and notifying him of his right to appeal the decision "via the Administrative Remedy process" within 20 days of his receipt of the letter. (Dkt. 314 at 8 (Ex. 2, Response to Request to Staff)).

While, as mentioned above, the Government's second response incorporates by reference its first response, including the argument that Reedy failed to exhaust administrative remedies by not submitting a compassionate relief request to the warden prior to his first and second motions, (Dkt. 316 ¶ 6), the Government, in its second response, never contends or shows that Reedy failed to appeal the denial of his compassionate release request prior to filing his third motion. Reedy also never argues or otherwise shows that he appealed the warden's denial of his request for compassionate release. But Reedy did file his third motion more than 30 days after the warden's receipt of his compassionate release request.

These facts thus present two issues. First, whether Reedy satisfied § 3582(c)(1)(A)'s exhaustion requirement by filing the third motion in this Court after "the lapse of 30 days from the receipt of [his compassionate release] request by the warden[,]" where the warden denied the request but it is not established whether Reedy appealed the denial. 18 U.S.C. § 3582(c)(1)(A). Second, whether the Government satisfied its burden of proving the affirmative defense of failure

11

to exhaust administrative remedies where the Government does not argue or show that Reedy never appealed the warden's denial of his compassionate release request.

The Seventh Circuit case law discussing the second path to the district court under § 3582(c)(1)(A)'s exhaustion requirement—where a defendant may file a compassionate release motion in the district court after "the lapse of 30 days from the receipt of such a request by the warden"—is not perfectly clear. 18 § 3582(c)(1)(A); *United States v. Villar*, 2024 WL 2939018, at \*3 (N.D. Ill. June 11, 2024) (noting that, where the BOP denied a defendant's compassionate release request, "there is a question of whether [the defendant] must have complete any administrative appeals process before filing his motion or simply waited thirty days"). Specifically, existing case law leaves ambiguous whether a defendant's ability to file a motion in the district court after "the lapse of 30 days from the receipt of [the defendant's compassionate release] request by the warden" implicitly requires, in addition to the "lapse of 30 days," the warden's failure to respond to the request. 18 U.S.C. § 3582(c)(1)(A). If the defendant's ability to file after the "lapse of 30 days" requires the warden's failure to respond, then a defendant who received a response to a compassionate release request from the warden must always appeal the decision administratively before filing in the district court.

While existing Seventh Circuit case law provides conflicting summaries of this second path to the district court under § 3582(c)(1)(A), mostly in dicta, it does not appear that the Seventh Circuit has yet fully interpreted whether waiting for the "lapse of 30 days from receipt of [the compassionate release] request" *implicitly* requires that the warden fails to respond to the defendant's request. If such a requirement applies, a defendant would always have to appeal a denial before filing in the district court in order to satisfy the exhaustion requirement in cases where the warden responds, regardless of whether 30 days have passed.

18 U.S.C. § 3582(c)(1)(A); *see Villar*, 2024 WL 2939018, at \*3. In *United States v. Gunn*, a case about whether a since-amended policy statement by the Sentencing Commission applied to compassionate release motions brought by defendants instead of the BOP, the Seventh Circuit briefly noted that, although the government did not raise the affirmative defense of failure to exhaust administrative remedies, § 3582(c)(1)(A) requires that "the prison first allowed the Bureau to review the request and make a recommendation (or [that the Bureau] let 30 days pass in silence)." 980 F.3d 1178, 1179 (7th Cir. 2020) (dictum); *see also United States v. Williams*, 829 F. App'x 138, 140 (7th Cir. 2020) (unpublished order) (explaining that "[t]he First Step Act amended § 3582(c)(1)(A) to permit an inmate to move for compassionate release as long as he exhausted his administrative appeals or the facility's warden did not respond to his compassionate-release request within 30 days").

In *United States v. Sanford*, the Seventh Circuit affirmed the district court's denial of a compassionate release motion filed three days after the submission of the defendant's request to the warden and held that § 3582(c)(1)(A)'s exhaustion requirement is a mandatory claim-processing rule that the district court, which had decided to skip to the merits, was required to enforce. *Sanford*, 986 F.3d at 780–82. The *Sanford* court presented three brief summaries of the second path under § 3582(c)(1)(A)'s exhaustion requirement. In one of these summaries, the *Sanford* court suggested that § 3582(c)(1)(A) requires "waiting for a response from the warden or letting 30 days lapse without a response[.]" *Sanford*, 986 F.3d at 780. In the other two summaries, however, the *Sanford* court does not seem to suggest that the second path of waiting for the "lapse of 30 days" implicitly requires the warden's failure to respond to the defendant's compassionate release request. *Id.* at 781–782 ("[T]he defendant must first present his request [...] to the warden and exhaust administrative appeals (if the request is denied) or wait '30 days from the receipt of

such a request by the warden of the defendant's facility, whichever is earlier.' ")
(Section 3582(c)(1)(A) requires "waiting for a response (and pursuing an administrative appeal)
or the lapse of 30 days."). Ultimately, because the defendant in *Sanford* filed his motion in the
district court just three days after submitting a request to the warden, resolution of whether the
second path of waiting for the "lapse of 30 days" requires the warden's failure to respond was not
necessary for the decision.

Most relevant to this case, the Seventh Circuit in *Unites States v. Martin* found a defendant
satisfied § 3582(c)(1)(A)'s exhaustion requirement solely on the basis that the record included "a
request made more than 30 days before initiating judicial proceedings[,]" without asking whether
the defendant had received a response to the request and whether the defendant appealed if they
did receive a response. 21 F.4th 944, 945 (7th Cir. 2021) (per curiam). And notably, out of all these
cases, *Martin* is the only case in which it was necessary for the court to resolve whether submitting
a request to the warden and simply waiting for the lapse of 30 days satisfies § 3582(c)(1)(A)'s
exhaustion requirement.

The Court therefore concludes that *Martin* is binding and controls the outcome of the
exhaustion issue in this case. As discussed above, *Martin* stands for the proposition that a
defendant may file a motion in the district court 30 days after the warden's "receipt" of a
defendant's compassionate release request, irrespective of whether the warden responds to the
request within 30 days and whether a defendant has administrative appeals available. *See Martin*,
21 F.4th at 945. This interpretation of the second path under § 3582(c)(1)(A) also follows from the
section's plain text and is consistent with the aims of the compassionate release provision and its
exhaustion requirement.

The plain text of § 3582(c)(1)(A) is unambiguous in its presentation of two discrete paths by which a defendant may proceed to the district court. A defendant may move the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or* the lapse of 30 days from the *receipt* of such request by the warden of the defendant's facility, *whichever is earlier*[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added). Section 3582(c)(1)(A) makes no suggestion that the second path to the district court—after "the lapse of 30 days from the receipt of [a defendant's compassionate release] request"—is only available where the warden has not responded to the request within that timeframe. *Id.* Rather, the passage of 30 days after the warden's "receipt" of the request is the only express requirement. *Id.* "Failure to respond" or similar language does not appear in the statute. *Id.*

And reading in such a limitation would render the phrase "whichever is earlier" surplusage, because no situation could ever exist where a defendant fully exhausted administrative appeals of a warden's denial of a defendant's compassionate release request "earlier" than the lapse of 30 days from the warden's receipt of and failure to respond to the request. If the warden fails to respond to a defendant's request within 30 days, then a defendant necessarily cannot fully exhaust administrative appeals within that timeframe, such that the lapse of 30 days after the warden's receipt of and failure to respond to the request, where it occurs, would always be "earlier." *Id.* But the language of the statute—"*whichever* is earlier"—clearly contemplates the scenario where the full exhaustion of administrative appeals is earlier than "the lapse of 30 days from the receipt of [the] request[.]" *Id.* (emphasis added); *see United States v. Garrett*, 15 F.4th 335, 338 (5th Cir. 2021). This structure—where *either* the full exhaustion of administrative appeals or the lapse of 30 days from the warden's receipt of the request can be the "earlier" event—means that the "lapse

of 30 days from the receipt of [the] request" cannot implicitly require the warden's failure to respond to the request. *Id.* Because such an implicit requirement would render impossible the scenario where full exhaustion of administrative appeals is the "earlier" event, a defendant's ability to proceed by the first or second path to the district court would not turn on "whichever [event] is earlier," but on whether the warden responded to a defendant's request within 30 days. And that is not what the statute says.

Furthermore, this reading of § 3582(c)(1)(A) is consistent with the aims of § 3582(c)(1)(A), as amended by the First Step Act in 2018. *See United States v. Wright*, 46 F.4th 938, 945 (9th Cir. 2022). These aims include providing defendants the ability to promptly litigate their compassionate release requests in court while also providing the BOP, via the exhaustion requirement, "the information necessary to move for release on a defendant's behalf" and 30 days to articulate its decision and rationale. *Id.* (explaining that the First Step Act amended the compassionate release statute to allow defendants to bring their own compassionate release motions in order to combat mismanagement and delays that marked the prior process in which the BOP had to move on a defendant's behalf); *see Gunn*, 980 F.3d at 1180; *see Williams*, 987 F.3d at 703. While § 3582(c)(1)(A) does not require a defendant to appeal a denial of a compassionate release request if a defendant is willing to wait for the lapse of 30 days from the warden's receipt of the request before filing in the district court, § 3582(c)(1)(A)'s issue exhaustion requirement, as discussed above, ensures the proper presentation of the basis for the request and the relevant supporting information to the BOP. *See Williams*, 987 F.3d at 703.

This reading is also consistent with the law in a majority of other circuits, which have held that, according to the plain text of § 3582(c)(1)(A), a defendant may file in the district court once 30 days have passed since the warden's receipt of a defendant's compassionate release request,

"irrespective of whether the BOP has responded to the request or whether [a defendant] has administrative appeals available[.]" *United States v. Garrett*, 15 F.4th 335, 337–39 (5th Cir. 2021); *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020) ("The Government argued [...] that because the Warden denied Harris's request within thirty days, he was required to completely exhaust the administrative remedy process[,] [...] but the statute states that the defendant may file the motion thirty days after the warden receives his request."); *United States v. Muhammad*, 16 F.4th 126, 131 (4th Cir. 2021) ("[W]e readily conclude that the threshold requirement in § 3582(c)(1)(A) is [...] satisfied if a defendant [...] either fully exhausts all administrative rights to appeal the Bureau's decision or waits 30 days from the date of their initial request to file a motion in the district court."); *United States v. Alam*, 960 F.3d 831, 833–34 (6th Cir. 2020) ("Prisoners who seek compassionate release have the option to take their claim to federal court within 30 days, no matter the appeals available to them."); *see United States v. Keller*, 2 F.4th 1278, 1283 (9th Cir. 2021); *see United States v. Harris*, 989 F.3d 908, 910 (11th Cir. 2021); *see United States v. Wilson*, 77 F.4th 837, 838–39 (D.C. Cir. 2023) ("Wilson waited the required time of thirty days after the warden received his initial request for compassionate release, but chose not to bring it on his behalf, to file his own motion in district court.").

Because Reedy submitted a compassionate release request to the warden more than 30 days prior to the filing of the third motion in this Court, Reedy thus properly followed the second path to the district court under § 3582(c)(1)(A) by filing after the "lapse of 30 days" from the warden's receipt of his compassionate relief request. The fact the warden responded to his request within 30 days does not block that path. Accordingly, Reedy satisfied § 3582(c)(1)(A)'s exhaustion requirement with respect to his third motion.

Furthermore, even if a defendant's ability to file after "the lapse of 30 days from the receipt of [the] request" under § 3582(c)(1)(A) did implicitly require the warden's failure to respond, the Court would nonetheless concludes that the Government failed to satisfy its burden of proof with respect to the affirmative defense of failure to exhaust administrative remedies by not attempting to show or even arguing that Reedy failed to appeal the warden's denial of his compassionate relief request. *See United States v. Cardena*, 461 F. Supp. 3d 798, 802 (N.D. Ill. 2020); *see United States v. Williams*, 62 F.4th 391, 393 (7th Cir. 2023).

### B. Merits

Under § 3852(c)(A)(1), the merits analysis of a compassionate release motion has three steps. 18 U.S.C. § 3852(c)(A)(1). First, the Court asks whether "extraordinary and compelling reasons warrant" a modification of the imposed term of imprisonment. 18 U.S.C. § 3852(c)(A)(1)(i). Second, the Court considers the applicable § 3553(a) sentencing factors. 18 U.S.C. § 3852(c)(A)(1)(ii); 18 U.S.C. § 3553(a). Third, the Court asks whether a modification of the imposed term of imprisonment would be consistent with the applicable policy statements of the Sentencing Commission. 18 U.S.C. § 3852(c)(1)(A). To obtain compassionate release, a defendant must prevail at each step. *Id.*

#### 1. Extraordinary and Compelling Reasons

At step one of the merits analysis, the Court asks whether "extraordinary and compelling reasons warrant" a modification of the imposed term of imprisonment. 18 U.S.C. § 3852(c)(A)(1)(i). Because the compassionate release provision requires the Court to find that any potential modification is consistent with applicable policy statements issued by the Sentencing Commission, 18 U.S.C. § 3582(c)(1)(A), the Court must follow the Sentencing Commission's guidance on which factors and circumstances qualify as "extraordinary and compelling reasons," as outlined in the corresponding policy statement, U.S.S.G. § 1B1.13.

Additionally, the Court must consider the factors holistically, even where no one factor alone qualifies as an extraordinary and compelling reason. *United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023) ("Our point, rather, is that no matter how the threshold is defined, a combination of factors may move any given prisoner past it, even if one factor alone does not."). Reedy bears the burden of establishing an extraordinary and compelling reason for his release. *United States v. Barbee*, 25 F.4th 531, 532 (7th Cir. 2022)

As relevant here, the Sentencing Commission's policy statement governing compassionate release, § 1B1.13, instructs that the following factors, except for rehabilitation, independently qualify as extraordinary and compelling reasons for a reduction in sentence:

(1) A defendant suffers from a serious medical condition or experiences deteriorating physical health due to the aging process, which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B).

(2) A defendant suffers from a medical condition that "requires long-term or specialized care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C).

(3) A defendant is housed at a correctional facility "affected or at imminent risk of being affected by an outbreak of infectious disease," is at "increased risk of suffering severe medical complications or death as a result of exposure" to the infectious disease due to the defendant's "personal health risk factors and custodial status," and such risk cannot be "adequately mitigated in a timely manner[.]" U.S.S.G. § 1B1.13(b)(1)(D).

(4) A defendant has an "incapacitat[ed]" spouse for whom the defendant "would be the only available caregiver[.]" U.S.S.G. § 1B1.13(b)(3)(B).

(5) In combination with other qualifying circumstances, a defendant has undergone rehabilitation while serving the term of imprisonment. U.S.S.G. § 1B1.13(d).

Because Reedy's first and second motions did not comply with § 3582(c)(1)(A)'s exhaustion requirement, the Court considers only the factors and circumstances raised in Reedy's third motion. *Williams*, 987 F.3d at 703. In the third motion, Reedy contends the following circumstances qualify as extraordinary and compelling reasons for a reduction of sentence: (1)

Reedy's medical conditions (type 2 diabetes and early onset kidney disease) and his resulting "susceptibil[ility] to contract[ing] a serious contagion," such as COVID-19; (2) Reedy's spouse's need for a caretaker due to her medical conditions, including scoliosis, degenerative disc disease, obesity, arthritis, and fibromyalgia, which render her unable to work and "legally disabled" for the purposes of social security benefits; and (3) Reedy's rehabilitation during his term of imprisonment. (Dkt. 314 at 1–3). Reedy asserts he is the only available caregiver for his spouse due to "his adult children's college [obligations][,]" "professional obligations," and family obligations. (*Id.* at 3, 5). Reedy argues that a transition to home confinement would allow him to care for his spouse, seek "adequate" medical care for himself, and provide financial stability for his spouse. (*Id.* at 1–2). The warden denied Reedy's compassionate release request for the following reasons: (1) Reedy does not have a "medical condition that is terminal or debilitated[;]" and (2) Reedy did not provide "evidence of the incapacity of [his] spouse," noting that "incapacitation is defined as confined to a bed or chair[.]" (Dkt. 314 at 8 (denial letter)).

### i. *Reedy's Medical Conditions & Risk of COVID-19*

With respect to Reedy's claim that his medical conditions (type I diabetes and early onset kidney disease) render him more susceptible to infectious diseases like COVID-19, the Court must evaluate three factors: (1) whether Reedy is "housed at a correctional facility 'affected or at imminent risk of being affected by an outbreak of infectious disease"; (2) whether Reedy is at increased risk of suffering severe medical complications or death as a result of exposure" to the infectious disease due to Reedy's "personal health risk factors and custodial status"; and (3) whether the increased risk cannot be "adequately mitigated in a timely manner[.]" U.S.S.G. § 1B1.13(b)(1)(D). While the Court is sympathetic to Reedy's health concerns, the record does not support the conclusion that Reedy's medical conditions and the risk posed by

20

COVID-19 and other infectious diseases present an extraordinary and compelling reason for Reedy's release.

First, Reedy does not argue or otherwise show that FCP Duluth is currently affected or at imminent risk of being affected by a COVID-19 outbreak. Second, Reedy's health records show that his medical conditions and the risk of COVID-19 are adequately managed at FCP Duluth. Since 2022, he has received medical care for his diabetes and his chronic kidney disease, which his medical providers describe as "mild." (*See, e.g.*, Dkt. 309 at 2, 7–9, 53–57; *see, e.g.*, Dkt. 310 at 31, 60). Reedy also receives prescription medication to treat his diabetes. (Dkt. 309 at 29). In November 2022, Reedy refused a recommended prescription medication for his mild kidney disease. (Dkt. 311 at 166). Ultimately, while Reedy claims that a transition to home confinement would allow him to obtain "adequate" medical care, Reedy does not establish that the medical care he currently receives is deficient, or that his type I diabetes and early onset kidney disease require "long-term or specialized care" unavailable in prison and without which he is a "risk of serious deterioration of health or death." U.S.S.G. § 1B1.13(b)(1)(C).

Furthermore, Reedy contracted COVID-19 in March 2021, prior to his term of incarceration, and he does not allege nor does the record contain information suggesting that he suffered severe complications. (Dkt. 310 at 142). Reedy subsequently received two COVID-19 vaccine doses in 2021. (Dkt. 309 at 2; Dkt. 311 at 193). And though one medical record seems to suggest that Reedy is "high risk" with respect to COVID-19 due to his diabetes, the record does not specify the potential health outcomes with any particularity or call into question the effectiveness of the vaccine in mitigating that risk. (Dkt. 310 at 123). Reedy does not provide any other documentation regarding the risk COVID-19 presents to him. And more conclusively, because Reedy has not shown that he is "is unable to receive or benefit from a[n] [additional]

vaccine[,]" the Court finds no reason to depart from the Seventh Circuit's guidance that "the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." *Broadfield*, 5 F.4th 801, 803.

Furthermore, even assuming that Reedy, despite his prior vaccination and presumptive access to booster vaccines, has a high risk of severe complications in the event of a breakthrough infection, Reedy "has not provided any data suggesting that he is at greater risk of a dire outcome inside prison than he would be outside—and if he would remain at comparable risk outside prison, the possibility of infection cannot be described as an 'extraordinary and compelling' consideration supporting release." *United States v. Vaughn*, 62 F.4th 1071, 1071–72 (7th Cir. 2023) ("The vaccination rate among federal prisoners and guards is substantial, and for all we can tell prisoners today are safer inside than they would be outside."); *United States v. Clemons*, 2022 WL 1436801, at *2 (7th Cir. May 6, 2022) (noting that booster vaccinations are available to prisoners under BOP policy). To the contrary, "published data do not establish or imply an incremental risk for prisoners—either a risk of contracting the disease after vaccination or a risk of a severe outcome if a vaccinated person does contract the disease." *United States v. Broadfield*, 5 F.4th 801, 802–03 (7th Cir. 2021); *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021); *United States v. Barbee*, 25 F.4th 531, 533 (7th Cir. 2022) (holding that availability of vaccine foreclosed the possibility that risk of COVID-19 to prisoner with diabetes, obesity, and hypertension could qualify as an extraordinary and compelling reason for release where prisoner does not show they are unable to benefit from vaccine); *see United States v. Cancino*, 669 F. Supp. 3d 715, 718 (N.D. Ill. 2023) (holding that prisoner with diabetes, high blood pressure, and chronic kidney disease failed to show an extraordinary and compelling reason for release where prisoner did not show the medical

conditions could not be managed in prison, the record showed the prisoner receives medication for the conditions, and the availability of a vaccine mitigates the risk of COVID-19).

Reedy does not otherwise allege that the risk of other infectious diseases is inadequately managed at FPC Duluth. Rather, the medical records suggest that the medical care offered at FCP Duluth is adequate to manage the risk of infectious diseases. In May 2023, for example, medical staff treated Reedy's upper respiratory infection with cough syrup and Tylenol. (Dkt. 309 at 40). If anything, the record suggests that Reedy has decided not to receive the full extent of the medical care available to him. Reedy declined to receive an influenza vaccine in October 2022 and October 2023. (Dkt. 309 at 182, 192). The Court thus concludes that Reedy's medical conditions and the risk of COVID-19 and other infectious diseases are not an extraordinary and compelling reason for his release.

### ii.     Reedy's Spouse's Medical Conditions

With respect to Reedy's spouse's medical conditions, the Court considers (1) whether Reedy's spouse is "incapacitat[ed]" and (2) whether Reedy is "the only available caregiver[.]" U.S.S.G. § 1B1.13(b)(3)(B); *see Villar*, 2024 WL 2939018, at *3. While the relevant policy statement, § 1B1.13(b)(3)(B), does not define "incapacitated," the term's plain meaning—"made incapable of or unfit for normal functioning"—and the statutory context, especially the associated need for a "caregiver," make clear that "incapacitated" implies that the person is incapable of caring for themself. *Incapacitated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/incapacitated (last visited Nov. 26, 2024); U.S.S.G. § 1B1.13(b)(3)(B); *cf. United States v. Taveras*, at *3 (D. Mass. Apr. 12, 2024). And while the BOP's interpretation of the Sentencing Commission's policy statement is not binding on this Court, the Court also notes that BOP Program Statement No. 5050.50 § 6, defines "incapacitation" somewhat similarly, though the Court is not inclined to construe the policy statement so narrowly: the spouse

"[s]uffered a serious injury, or a debilitating physical illness[,] and the result of the injury or illness is that the spouse [...] is completely disabled, meaning that the spouse [...] cannot carry on any self-care and is totally confined to a bed or chair[.]" Federal Bureau of Prisons Program Statement 5050.50 § 6; *see Pelissero v. Thompson*, 170 F.3d 442, 447 (4th Cir. 1999) (explaining that a policy statement is "not a substantive rule but rather an interpretive statement of position circulated within an agency that serve to provide administrative guidance in applying a then existing published rule").

Here, Reedy's spouse suffers from scoliosis, lumbar spine degenerative disc disease, obesity, arthritis of the right fingers, and fibromyalgia. (Dkt. 314 at 1–3, 12). Reedy rests his submission solely on the record of a 2024 decision by a Social Security Administrative Law Judge. In June 2024, the ALJ concluded that these medical conditions limited the spouse's physical function—including her ability to sit, stand, and walk for long periods of time—and rendered her "legally disabled" for the purposes of her eligibility to receive disability benefits. (Dkt. 314 at 11–16). In making the decision, however, the ALJ noted that she has "the residual functional capacity to perform sedentary work," as defined in 20 C.F.R. § 404.1567(a) to include work involving lifting no more than 10 pounds and occasional walking and standing. (*Id.* at 14). While the record of the decision provided is incomplete, the ALJ's decision thus nonetheless appears to rest on the finding that she is "unable to perform any relevant past work." (*Id.* at 15); *see* 20 C.F.R. § 404.1560(a) (If "we cannot decide whether you are disabled at one of the first three steps of the sequential evaluation process [...], we will consider your residual functional capacity together with your vocational background[.]"). It is clear then that "legally disabled" does not mean "incapacitated" in this context. Based on the ALJ's finding that she is able to lift up to 10 pounds and that she is able to stand or walk for 2 hours in an 8-hour workday, the Court determines that

Reedy's spouse, though needing support, is not incapable of caring herself and thus not incapacitated within the meaning of the Sentencing Commission's policy statement governing compassionate release, U.S.S.G. § 1B1.13(b)(3)(B). (Dkt. 314 at 14).

Furthermore, even if Reedy's spouse were incapacitated, the ALJ's findings undermine Reedy's assertion that he is the only available caretaker. (Dkt. 314 at 3, 5). Specifically, the ALJ decision explicitly notes that Reedy's spouse "testified that her adult son lives with her and assists in managing the residence." (*Id.* at 12). The Court therefore determines that Reedy is not the only available caretaker for his spouse. Because Reedy's spouse is not incapacitated, and because Reedy is not the only available caretaker, the Court concludes that the medical conditions of Reedy's spouse are not an extraordinary and compelling reason for his release. Additionally, to the extent that Reedy also argues that he is an "economic caregiver" needed to provide financial support to his spouse, (*see* Dkt. 314 at 1–2), this argument also fails because, even assuming economic need could constitute an extraordinary and compelling reason (it is not at all clear that it can), Reedy has provided no evidence that his spouse's disability benefits are insufficient to support her financially or that other family members are unable to support her financially. *See United States v. Romano*, 707 F. Supp. 3d 233, 238 (E.D.N.Y. 2023).

### iii.    *Reedy's Rehabilitation Efforts*

Finally, the Court does not find Reedy's completion of classes, viewed in combination with the circumstances analyzed above, to be an extraordinary and compelling reason for his release. U.S.S.G. § 1B1.13(d). After all, "[t]aking classes while incarcerated is common rather than extraordinary." *Vaughn*, 62 F.4th at 1072. Given the significant shortcomings of Reedy's submissions regarding each of the individual circumstances, the Court thus also concludes that all of these circumstances, even when considered collectively, do not present an extraordinary and compelling reason for his release.

2. <u>Section 3553(a) Factors</u>

Even assuming Reedy established extraordinary and compelling reasons for a reduction of sentence, § 3582(c)(1)(A) requires the Court to consider the applicable § 3553(a) factors, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. §§ 3582(c)(1)(A), 3553(a). Given that Reedy has served less than a third of his 10-year sentence, the Court determines that release would not reflect the seriousness of his heroin-based offense, promote respect for the law, afford adequate deterrence to criminal conduct, or protect the public from the possibility of further crimes from the defendant. *United States v. Sarno*, 37 F.4th 1249, 1253 (7th Cir. 2022); *Ugbah*, 4 F.4th at 598.

3. <u>Public Safety Under U.S.S.G. § 1B1.13</u>

Above, the Court considered the Sentencing Commission's instructions on what circumstances qualify as "extraordinary and compelling reasons," as outlined in the policy statement governing modification of terms of imprisonment contained in § 1B1.13. U.S.S.G. § 1B1.13. This policy statement requires that the Court not just to consider any potential risk to public safety as a discretionary factor, as the Court does under § 3553(c), but also to expressly determine whether Reedy is "a danger to the safety of any other person or the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13. Given the seriousness of Reedy's offense, the significant threat to public safety posed by heroin distribution, and the fact that Reedy has served only a minor fraction of his sentence, the Court cannot find that Reedy is not a danger to the community. A reduction of sentence would therefore be inconsistent with the Sentencing Commission's policy statement governing sentence modifications. U.S.S.G. § 1B1.13.

## CONCLUSION

For the reasons above, the Court denies Reedy's motions for a reduction of sentence [298, 303, 314].



Virginia M. Kendall
United States District Judge

Date: December 30, 2024